ALAN J. KARCHER *ET AL.*, PLAINTIFFS-APPELLANTS, v. BRENDAN T. BYRNE *ET AL.*, DEFENDANTS-RESPON-DENTS.

GAWRONS, INC., PLAINTIFF-APPELLANT, v. BRENDAN T. BYRNE *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued February 5, 1979—Decided March 21, 1979.

*Mr. Alan J. Karcher* argued the cause for appellants (*Messrs. Karcher, Reavey & Karcher,* attorneys).

*Mr. Alfred E. Ramey, Jr.,* Deputy Attorney General, argued the cause for respondents (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Ms. Erminie L. Conley,* Assistant Attorney General, of counsel).

The opinion of the court was delivered by

SULLIVAN, J. The consolidated appeal herein, filed as of right in two separate cases, involves certain aspects of the Public School Education Act of 1975. *N. J. S. A.* 18A:7A-1 *et seq.* The 1975 Act was passed in response to the mandate of this Court in *Robinson v. Cahill* (*I* through *IV*), 62 *N. J.* 473 (1973), *cert.* den. 414 *U. S.* 976, 94 *S. Ct.* 292, 38 *L. Ed.* 2d 219, 63 *N. J.* 196 (1973), *cert.* den. 414 *U. S.* 976, 94 *S. Ct.* 292, 38 *L. Ed.* 2d 219 (1973), 67 *N. J.* 35 (1975) and 69 *N. J.* 133 (1975) that, under the *N. J. Const.,* Art. VIII, § IV, par. 1, it was the Legislature's obligation to provide for the maintenance and support of a thorough and efficient system of free public schools. In *Robinson* (*V*), 69 *N. J.* 449 (1976), we found the 1975 Act to be facially constitutional (assuming it was fully funded).

The appeal herein basically involves two aspects of the allocation formula for equalization aid to school districts for current expenses contained in section 18 of the 1975 Act. One of the factors used in the formula is resident enrollment which is defined in section 3 as:

\* \* \* The number of pupils who are resident of the district and *are enrolled* in day or approved evening schools on the last school day of September of the pre-budget year and *are attending the public schools of the district* \* \* \*. (emphasis added)

The formula involves other factors such as the equalized value of real property ratables in each district.[1] However, generally the poorer the district in ratables the more aid per pupil and the more public school pupils in a district, the greater the amount of state aid it would receive.

Plaintiffs-appellants contend that the statutory restriction of the formula to public school children, thereby excluding those pupils attending private and parochial schools in a district, means less state equalization aid to a district than if private and parochial school pupils were included in the formula. The result, according to plaintiffs, is higher real estate taxes in the district since, basically the difference between state aid and a school district's expenses of operation must be raised by local taxation.

In the *Karcher* suit plaintiffs are the members of a family living in the Borough of Sayreville. The husband and wife own the family home and pay real property taxes to the borough. Approximately 70% of the money raised by taxes in Sayreville is used for the support of the local public school system. The Karchers are members of the Roman Catholic Church and two of their three children attend Catholic schools. Defendants named are the Governor of New Jersey, the Treasurer and the Commissioner of Education.

The Karchers allege that the statutory formula for distributing state equalization aid to local school districts, by failing to include pupils attending sectarian schools, denies them due process and equal protection and has a

---

[1] For a detailed summary of the funding formula see *Robinson (V)*, *supra*, 69 *N. J.* at 482–483 (Conford, P. J. A. D., T/A, concurring and dissenting).

chilling effect upon their first amendment right to the free exercise of their religion. Specifically, it is contended that the Karcher children, now attending Catholic schools, can be included in the formula only if they surrender their constitutionally guaranteed freedoms by transferring to public schools. The parents contend that by exercising their right to send their children to a Catholic school they are being forced to pay higher real property taxes than they otherwise would have to pay.

The Karchers also charge that the Commissioner's use of enrollment figures in applying the formula without giving consideration to attendance (whether it be average attendance or some variation thereof) is contrary to the statutory requirement that the figure to be used is "the number of pupils who * * * are enrolled * * * and are attending the public schools of the district * * *." They allege that their local public school district has a low absentee rate as compared with some other districts which have consistently higher absentee rates so that if the attendance requirement were taken into consideration, their local public school district would receive a larger amount of state aid.

In the *Karcher* case, the trial judge granted a summary judgment in favor of defendants. In an opinion reported at 146 *N. J. Super.* 532 (Law Div. 1977) he found plaintiffs' contentions as to the non-inclusion of sectarian school pupils in the distribution formula to lack merit. He noted that the increased tax burden, if any, did not "target" parochial school families but would be shared by all Sayreville taxpayers. *Id.* at 537. More importantly, however, he concluded that the purpose of the equalization aid formula was to adjust the varying abilities of local school districts to support their public schools and that counting non-public school pupils, would give a local school district equalization aid to meet a cost that did not exist. *Id.*

The trial judge also found the Commissioner's use of September 30 enrollment figures satisfied the statutory phrase "enrolled * * * and * * * attending." He reviewed

the legislative history of the language and its administrative application over the years under prior statutes using the same language, and concluded that the Legislature could not have intended to call for a wholly new set of rules when it used the same language in the new act. In summary he noted:

> September-end enrollment may well be an imperfect reflection of all actual school costs. But it is an accurate measure of fixed costs, which do not vary with attendance and which form the major part of districts' current expenses. State aid must be clearly determined in order to be considered in local budget decisions. See *N. J. S. A.* 18A:7A-27 and 28. New Jersey has had its experience with year-end aid adjustments and their unpredicted surprises. In 1966 the law was changed to avoid those results. There is no reason to believe the Legislature wrote Chapter 212 to recreate those problems. The Commissioner's practice accurately reflects the Legislature's intent.
> 146 *N. J. Super.* at 540.

In the *Gawrons* suit, plaintiff is a corporate property owner and taxpayer in the City of South Amboy. It also challenged the non-inclusion of parochial school children in the State equalization aid formula as an arbitrary, unreasonable and capricious refusal by defendants to include all students eligible for enrollment in the State aid formula. It alleged that South Amboy is a "Catholic enclave" with a large parochial school population and that, as a taxpayer, it is obliged to pay higher taxes because of the non-inclusion of parochial school pupils, thus denying it due process and equal protection of the laws solely "as a result of the fact that the individual citizens of the City of South Amboy have chosen, in large numbers, to exercise their religious freedoms." Gawrons also contended that the higher taxes imposed on it as a result of the formula "constitute an indirect subsidy for the establishment of religion within the City of South Amboy."

The trial judge in an unreported opinion granted summary judgment against Gawrons and in favor of defendants es-

sentially for the same reasons set forth in his opinion on the previously decided *Karcher* case.

Appeals having been filed in each suit by the Karchers and Gawrons respectively, an order of consolidation was entered by the Appellate Division. Following argument, the Appellate Division, in an opinion reported at 158 *N. J. Super.* 67 (1978), affirmed the summary judgments in favor of defendants substantially for the reasons expressed by the trial judge in his reported opinion in *Karcher, supra.*

Plaintiffs filed an appeal to this Court as of right pursuant to *R.* 2:2–1(a). We affirm.

■ The contention that the statutory formula for distribution of equalization aid to school districts, in failing to include sectarian school pupils in the computation, is violative of due process, equal protection and first amendment rights, is lacking in any merit. We are in substantial accord with the trial judge's reasoning in rejecting these contentions but add the following comments.

Plaintiffs' major premise is that pupils attending sectarian schools must be included in the statutory formula for aid to public schools as a matter of right and entitlement. Citing language taken from the Education Clause of the *New Jersey Constitution,* Art. VIII, § IV, par. 1, they assert that the constitutional mandate of the clause requires that any formula must provide for "all children between the ages of five and eighteen." Based on this premise, they find the violations of constitutional rights alleged. However, the fallacy in their position is that they start with an untenable premise.

■ The Education Clause of the Constitution means that all children between the ages of five and eighteen have a right to a public school education and the Legislature is mandated to provide for the maintenance and support of a thorough and efficient system of free public schools for that purpose. However, the clause is not concerned with children attending non-public schools. As noted in *Robinson (V), supra,* 69 *N. J.* at 464–466, the Legislature recognized

that many school districts were unable, by themselves, to fund the cost of public school education due *inter alia* to the lack of an adequate tax base for educational purposes as indicated by the gross disparities shown in per pupil tax resources in the various school districts. Consequently, in fulfillment of its constitutional obligation to provide for the maintenance and support of the public school system, the Legislature devised the allocation formula for state aid as part of the statutory plan to give financial assistance proportionate to the ability of a district to fund its own public school costs.

The plan concerns only the cost of educating pupils in the public schools. Logically and reasonably, one of the elements of the plan is the number of pupils in the public school system to be educated. It is a *non sequitur* to contend that pupils attending non-public schools should be included in the computation since the particular school district bears no part of the financial expenses of educating these pupils. As the trial judge pointed out, to count non-public school pupils in allocating state aid to a school district, would be rendering financial assistance for a cost that does not exist. 146 *N. J. Super.* at 537.

Plaintiffs' contentions fail because the statutory classification used in the state aid formula manifestly is neither arbitrary, invidious nor discriminatory in a constitutional or any other sense. Indeed, were non-public school pupils to be included in the formula for state aid to school districts, a serious question as to the validity of such a formula would be presented.

The Karchers' argument that it is improper for the Commissioner to use September 30 enrollment figures in applying the state aid formula is more colorable. The Act does define "resident enrollment," which is one of the factors in the formula, as "the number of pupils who are * * * *enrolled* * * * *and* are *attending* the public schools of the district." (emphasis added). The Karchers argue that use of enrollment figures only is contrary to the plain lan-

guage of the Act. They allege that variations in attendance as between certain school districts are substantial and use of the attendance factor would result in increased state aid to a district such as their own which has an average high rate of attendance. However, conversely, districts with poor attendance records would have their state aid diminished and it seems to be conceded that the school districts with the poorest attendance figures are located in the depressed urban areas.

We conclude that the Commissioner's use of September 30 enrollment figures is in accord with the statutory plan. On this score, we agree fully with the trial court's reasoning based on the legislative history of the enrolled and attending phrase and its administrative interpretation over the years. As noted by the trial judge, inclusion of attendance figures in the formula would require year-end aid adjustments, a feature discarded by the Legislature in 1966.

Beyond that, however, the statutory construction urged by the Karchers would be counter-productive to the purpose of state aid which, as heretofore noted, is to give financial assistance, proportionate to need, to those districts unable to fund the cost of public school education adequately.

The school districts which need state aid the most are those located in the depressed urban areas. Usually they are faced with inadequate tax ratables and high pupil enrollment, not to mention municipal overburden.[2] Yet, these same districts must also contend with poor pupil attendance, a social problem which itself generates additional remedial expenses. Also, most of a school district's costs are fixed and do not vary with attendance as compared with enrollment.

It would frustrate the plan for state aid as set forth in the 1975 Act if these districts were to have financial assistance diminished solely because of pupil attendance figures.

---

[2] See *Robinson (V)*, *supra*, 69 *N. J.* 553–556 (Pashman, J., dissenting).

Indeed, an argument could be made that the Legislature should increase State aid to school districts with poor pupil attendance so that they might take more effective steps to remedy this social problem, using special classes and other kinds of affirmative action.

A contention, raised for the first time on appeal by appellant Gawrons, is that the operative impact of the formula in the 1975 Act makes the Act a special or local law relating to taxation in violation of the *N. J. Constitution,* Article IV, § VII, par. 9(6). The reasoning used is that the operation of the formula causes corporations in the City of South Amboy to pay higher and more burdensome taxes than would be imposed on them "if they were not to be located in a community that was a 'Catholic enclave.'" This contention is also lacking in any merit being based on the same untenable premise fully disposed of by our ruling sustaining the legality of the formula.

Affirmed.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For reversal*—None.